UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| TABETHA A. TURNBAUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:20 CV 46 ACL |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM**

Plaintiff Tabetha A. Turnbaugh brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her applications for child's Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Turnbaugh's severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

---

[1]Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.   Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Kilolo Kijakazi is substituted for Andrew Saul as defendant in this action.   No further action is needed for this action to continue.   *See* 42 U.S.C. § 405(g) (last sentence).

For the following reasons, the decision of the Commissioner will be affirmed.

## I.  Procedural History

On July 24, 2017, Turnbaugh filed her applications for DIB and SSI benefits.   (Tr. 294-97, 288-93.)   She claimed that she became unable to work on November 30, 2015, due to memory and cognitive problems following a motor vehicle accident, multiple fractures, chronic pain, depression, anxiety, and morbid obesity.   (Tr. 322.)   Turnbaugh was 21 years of age at her alleged onset of disability date.   Her applications were denied initially.   (Tr. 133-46.) Turnbaugh's claims were denied by an ALJ on November 20, 2019.   (Tr. 11-23.)   On June 25, 2020, the Appeals Council denied Turnbaugh's claim for review.   (Tr. 1-5.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Turnbaugh argues that the ALJ "did not analyze the treating physician's opinion correctly under 404.1520."   (Doc. 17 at 9.)   She also argues that the "RFC constructed by the ALJ is not supported by the weight of the evidence."   *Id.* at 17.

## II.  The ALJ's Determination

The ALJ first found that Turnbaugh had not attained age 22 as of November 30, 2015, the alleged onset date.   (Tr. 14.)   He stated that Turnbaugh has not engaged in substantial gainful activity since her alleged onset date.   *Id.*   In addition, the ALJ concluded that Turnbaugh had the following severe impairments:   obesity, residual effects of multiple fractures (including the left femur, right radius, right scapula, left tibia, and a scalp evulsion), obstructive sleep apnea, and depression and anxiety associated with residual effects of a traumatic brain injury.   *Id.*   The ALJ found that Turnbaugh did not have an impairment or combination of impairments that met

or medically equaled the severity of one of the listed impairments.   *Id.*

As to Turnbaugh's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) in that the claimant can lift 10 pounds occasionally and frequently; stand and/or walk for 2 hours out of an 8 hour work day with normal breaks; sit for up to 6 hours out of an 8 hour work day with normal breaks; and push and pull the same weights; except the claimant has the option to stand up, move about, stretch, and change positions for one minute out of every 30 minutes while otherwise remaining on task; cannot climb ladders, ropes, or scaffolds; can occasionally stoop and balance; cannot kneel, crouch, or crawl; and frequently reach, handle, and finger on the right; must avoid concentrated exposure to excessive vibration, extremes of heat and cold, humidity, and pulmonary irritants; must avoid all exposure to unprotected heights; can perform simple, routine, repetitive tasks, involving occasional decision-making, occasional changes in the work setting, and no paced production work.

(Tr. 16.)

The ALJ found that Turnbaugh had no past relevant work, but could perform jobs existing in significant numbers in the national economy, such as call out operator, order clerk, and semi-conductor, bonder.   (Tr. 22.)   The ALJ therefore concluded that Turnbaugh was not under a disability, as defined in the Social Security Act, from November 30, 2015, through the date of the decision.   *Id.*

The ALJ's final decision reads as follows:

> Based on the application for child's insurance benefits protectively filed on July 24, 2017, the claimant was not disabled as defined in section 223(d) of the Social Security Act prior to August 20, 2016, the date she attained age 22.
>
> Based on the application for supplemental security income protectively filed on July 24, 2017, the claimant is not disabled

under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 23.)

## III.   Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).   Put another way, a court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

## III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful

work which exists … in significant numbers in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.   *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work."   *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."   *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id.*   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and

his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.   20 C.F.R. § 416.920(a)(4)(v).   At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."   20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   The Commissioner must then rate the degree of functional loss resulting from the impairments.   *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.   *See id.*   Next, the Commissioner must determine the severity of the impairment based on those ratings.   *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   *See* 20 C.F.R. §§ 404.1520a(c)(2),

416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating

of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental

disorders.   *See id.*   If there is a severe impairment, but the impairment does not meet or equal the

listings, then the Commissioner must prepare an RFC assessment.   *See* 20 C.F.R. §§

404.1520a(c)(3), 416.920a(c)(3).

## IV.   Discussion

Turnbaugh first challenges the ALJ's evaluation of treating nurse practitioner Rachel

Harris' opinion regarding Turnbaugh's physical[2] limitations.   She next challenges the ALJ's

RFC determination.   The undersigned will discuss these claims in turn.

### 1.   Opinion of Ms. Harris

For claims like Turnbaugh's that are filed on or after March 27, 2017, an ALJ evaluates

medical opinions and administrative medical findings pursuant to 20 C.F.R. § 404.1520c.   These

new rules provide that the Social Security Administration "will not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [Plaintiff's] medical sources."   20 C.F.R.

§ 404.1520c(a).   An ALJ is to evaluate the persuasiveness of medical opinions and prior

administrative medical findings in light of the following factors: (1) supportability; (2)

consistency; (3) relationship with the claimant, which includes: (i) length of the treatment

relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent

of the treatment relationship, and (v) examining relationship; (4) specialization, and (5) other

---

[2]Although the ALJ found that Turnbaugh has severe depression and anxiety, Turnbaugh does not
challenge the ALJ's determination regarding her mental limitations.   Thus, the Court's
discussion will focus on Turnbaugh's physical impairments.

factors, such as "evidence showing a medical source has familiarity with the other evidence in

the claim or an understanding of our disability program's policies."   20 C.F.R. § 404.1520c(a)-

(c).

Under the new regulations, supportability and consistency "are the most important

factors" to consider when determining the persuasiveness of a medical source's medical opinions

and, therefore, an ALJ must explain how he considered the factors of supportability and

consistency in his decision.[3]   20 C.F.R. § 404.1520c(b)(2).   An ALJ may, but is not required to,

explain how he considered the remaining factors.   *Id.; see also Brian O. v. Comm'r of Soc. Sec.*,

No. 1:19-CV-983-ATB, 2020 WL 3077009, at *4 (N.D.N.Y. June 10, 2020) (quoting 20 C.F.R.

§ 404.1520c(a), (b)) ("Although the new regulations eliminate the perceived hierarchy of

medical sources, deference to specific medical opinions, and assigning 'weight' to a medical

opinion, the ALJ must still 'articulate how he or she considered the medical opinions' and 'how

persuasive he or she finds all of the medical opinions.'"   (alterations omitted)).

Turnbaugh argues that the ALJ failed to properly evaluate the opinion evidence from Ms.

Harris.   Defendant responds that the ALJ properly evaluated the persuasiveness of Ms. Harris'

opinion under the new regulations.

Ms. Harris is a nurse practitioner that works in the office of primary care physician Aaron

Miller, M.D.   On February 18, 2019, Ms. Harris completed a "Medical Source Statement of

---

[3]"Supportability" refers to the principle that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."   20 C.F.R §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" refers to the principle that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."   20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

Ability to do Work-Related Activities (Physical)," in which she expressed the opinion that Turnbaugh was able to lift or carry ten pounds occasionally and frequently; stand and walk a total of less than two hours in an eight-hour workday; sit a total of two hours in an eight-hour workday; can sit or stand for thirty-minute periods before needing to change positions; must walk around every hour for ten-minute periods; and must be able to shift positions at will.   (Tr. 1152.)   Ms. Harris stated that these limitations were required because Turnbaugh's morbid obesity impacts her activity, and she experiences chronic back, hip, and knee pain.   *Id.*   Ms. Harris found that Turnbaugh could frequently reach, handle, finger, feel, and push or pull with her upper extremities; occasionally twist, stoop, crouch, climb stairs, and use her lower extremities; and could never climb ladders.   (Tr. 1153.)   Additionally, she found that Turnbaugh should avoid concentrated exposure to soldering fluxes, solvents/cleaners, and chemicals; and must avoid moderate exposure to high humidity, fumes, odors, dusts, gases, and perfumes.   (Tr. 1154.)   Ms. Harris expressed the opinion that Turnbaugh would be off task twenty-five percent or more of a typical workday; would need to take unscheduled breaks two or more times during the workday; and would be absent from work more than four days a month due to her impairments.   (Tr. 1153-54.)   Ms. Harris indicated that the medical findings supporting her opinion regarding Turnbaugh's limitations were as follows:   "weight, BMI, previous exams."   (Tr. 1154.)

The ALJ found that Ms. Harris' opinion was "not persuasive."   (Tr. 19.)   He stated that some aspects of the opinion, such as the limitations on lifting, standing, and walking, were consistent with the evidence; but the "overall opinion is far more restrictive than supported by the fairly unremarkable evidence regarding her ongoing physical condition."   *Id.*   For example, the ALJ noted that an ability to sit for two hours per day in conjunction with less than two hours

of standing and walking per day "indicates someone who is largely bedridden," which is "not supported by the record." *Id.* In addition, the ALJ stated that Ms. Harris found numerous postural and manipulative limitations "due to the mere existence of obesity and complaints of pain." *Id.* The ALJ stated that "no objective evidence, exam findings, or other supporting evidence is identified, and the record simply does not support this degree of limitation in most areas." *Id.* Finally, the ALJ found that there was no basis in the record for the numerous absences and time off task found by Ms. Harris. *Id.*

Turnbaugh argues that the ALJ erred in discrediting Ms. Harris' opinion, because the opinion is consistent with the injuries she sustained in the November 2015 automobile accident, and the chronic pain she has reported since the accident.

The undersigned finds that the ALJ properly evaluated Ms. Harris' opinion. The ALJ acknowledged that Turnbaugh sustained a number of serious injuries from the November 2015 automobile accident. He described these injuries as follows:

> Her injuries included a scalp laceration, open fracture of the right humerus, fracture of the right radius, closed fracture of the left femur, open fracture of left tibia and fibula, and fracture of the lumbar spine. She also experienced a traumatic brain injury. Surgical treatment was required for her injuries. Following the accident, she was inpatient until February 2016.

(Tr. 17) (internal citations omitted). The ALJ accurately noted that, although Turnbaugh was obviously unable to work during this period, she must demonstrate she was unable to engage in any work activity *for a period of at least twelve months*. *See* 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). He pointed out that Turnbaugh reported that she "felt better overall" at a March 2016 follow-up with Archie A. Heddings, M.D., at the University of Kansas Hospital. (Tr. 18, 867.)

At this visit, Dr. Heddings indicated that Turnbaugh underwent surgical repair of a left femur fracture and left tibia fracture fifteen weeks prior; and underwent surgical repair of a right humeral fracture thirteen weeks prior.   (Tr. 867.)   Turnbaugh complained of pain over her left clavicle.  *Id.*   On examination, Turnbaugh had slightly reduced strength in the left leg (4 out of 5) and her left tibia was still incompletely united anteriorly; she could not yet extend the wrist, fingers, or thumb of the right arm; radial nerve palsy was noted; she had a limited range of motion in the right elbow; and she had paresthesia in the left little finger.   (Tr. 867, 18.)   Dr. Heddings indicated Turnbaugh was weight-bearing as tolerated in her right upper extremity and left lower extremity.   (Tr. 867.)   He ordered a brace for the right wrist.   *Id.*   At her next follow-up appointment at the University of Kansas Hospital, Turnbaugh complained of wrist stiffness and some wrist pain.   (Tr. 872.)   Some stiffness was noted on examination of the right wrist.   (Tr. 873.)   The examining physician, Wojciech Pryzlecki, M.D., noted that her right arm impairment was improving.   *Id.*   In November 2016, Dr. Pryzlecki noted Turnbaugh's right wrist was improved on examination.   (Tr. 877.)

The ALJ stated that the medical record demonstrates that Turnbaugh had a good recovery just a few months after the accident.   (Tr. 18.)   He stated that her retained strength suggests an ability to stand and walk at least consistent with sedentary work.   The ALJ acknowledged that the still healing fracture of the tibia indicates she was likely unable to engage in greater quantities of standing and walking at that time, particularly given her obesity.   *Id.*

The ALJ next pointed out that, although Turnbaugh alleges an onset of disability date of November 30, 2015—the date of the accident—she testified that she stopped working in April 2014 when the company for which she was working closed.   (Tr. 17, 322.)   Leaving work due to a reason other than one's alleged disability weighs against credibility.   *See Milam v. Colvin,*

794 F.3d 978, 985 (8th Cir. 2015); *Medhaug v. Astrue*, 578 F.3d 805, 816-11 (8th Cir. 2009) (affirming the denial of benefits where claimant left work due to being laid off).

Thus, contrary to Turnbaugh's argument, the ALJ adequately considered the injuries Turnbaugh sustained in the 2015 accident when evaluating Ms. Harris' opinion.   The ALJ reasonably found that Turnbaugh had not shown an inability to perform any work for a twelve-month period due to these injuries.

The ALJ also considered Turnbaugh's obesity when assessing whether Ms. Harris' opinion was consistent with the record.   The SSA recognizes that "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately."   20 C.F.R. § 404, Subpt. P, App'x 1, § 1.00(Q).   *See also* SSR 02–1p, 2002 WL 34686281, at *3 (Sept. 12, 2002).   Thus, at all stages of the sequential evaluation process, including the RFC determination, "adjudicators must consider any additional and cumulative effects of obesity."   20 C.F.R. § 404, Subpt. P, App'x 1, § 1.00(Q).   However, the United States Court of Appeals for the Eighth Circuit has held that "[w]hen an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal."   *Wright v. Colvin*, 789 F.3d 847, 855 (8th Cir. 2015) (quoting *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009)).

The ALJ found that Turnbaugh's obesity was a severe impairment.   (Tr. 14.) Turnbaugh reported a height of five feet two inches and a weight of 330 pounds in her application for benefits, which the ALJ noted equated to a BMI consistent with obesity.   (Tr. 17, 322.)   In June 2018, Turnbaugh was evaluated by a surgeon for a gastric sleeve procedure.   (Tr. 17, 1158.)   Turnbaugh weighed 425 pounds at that time.   (Tr. 1158.)   A small amount of edema of the lower extremities was noted on examination; but her examination was otherwise

unremarkable, with no neurological, sensory, or motor abnormalities.   (Tr. 1159.)   Turnbaugh

was diagnosed with "morbid obesity due to excess calories."   (Tr. 1157.)   Because her BMI

was greater than 70, she was not a surgical candidate at that time.   (Tr. 1159.)   She was

counseled on lifestyle modifications, including diet and exercise.   *Id.*   The ALJ noted that the

record reflected a "troubling degree of obesity," and that her excessive weight was "likely to

exacerbate her symptoms."   (Tr. 17.)   He stated that Turnbaugh's obesity "was considered

when assessing the extent of her symptoms and resulting limitations."   *Id.*

The ALJ stated that, at an August 2018 follow-up with primary care physician Dr. Miller,

Turnbaugh reported that she had been motivated to lose weight and "has been going to the gym

up to 5 times a week," and had tried to change her diet.   (Tr. 18, 1200.)   She weighed 426

pounds.   (Tr. 1201.)   Turnbaugh reported some muscle strain to the right lower rib, but no

shortness of breath, cough, wheezing, or chest pain.   (Tr. 1200.)   On examination, Turnbaugh

was morbidly obese but in no distress and her cardiovascular, respiratory, and neurologic

examinations were normal.   (Tr. 1201.)   In October 2018, Turnbaugh reported that she had

been walking regularly.   (Tr. 1203.)   She complained of chronic bilateral knee and low back

pain since the accident.   *Id.*   Turnbaugh reported that her pain medication had been helping.

*Id.*   In November 2018, Turnbaugh's only complaint was an inability to lose weight.   (Tr.

1206.)   Dr. Miller encouraged her to count calories for weight reduction.   (Tr. 1208.)

In December 2018, Turnbaugh saw Ms. Harris, at which time she complained of

frustration due to weight gain.   (Tr. 1209.)   She reported she had been walking a lot and had

been swimming and lifting weights at the YMCA.   *Id.*   On examination, Ms. Harris noted trace

pedal edema, but normal motor strength of the upper and lower extremities, intact sensory exam,

and normal neurologic exam.   (Tr. 1211.)   On January 1, 2019, Turnbaugh presented to the

emergency room with reports of worsening low back pain "after she lifted and moved some heavy objects" two to three days prior.   (Tr. 18, 1029.)   Imaging of the lumbar spine revealed only "mild" degenerative disc disease at T11-12.   (Tr. 18, 1033.)   Turnbaugh saw Ms. Harris for follow-up three days later, at which time she reported "feeling great" and was walking with her family, cooking, and helping clean.   (Tr. 1213.)   On February 1, 2019, Turnbaugh reported that she had been working on diet and exercise.   (Tr. 1217.)   She requested a change in her pain medication for insurance purposes and reported that the medication helped with her chronic knee and back pain due to her weight.   *Id.*   On examination, Ms. Harris noted only decreased pedal pulses bilaterally.   (Tr. 1219.)   On February 18, 2019—the day Ms. Harris authored her opinion—Ms. Harris indicated that Turnbaugh had undergone a sleep study that showed severe obstructive sleep apnea.   (Tr. 1221.)   Ms. Harris ordered a CPAP.   *Id.*   On examination, she noted only decreased pedal pulses.   (Tr. 1222.)

The ALJ stated that this more recent medical evidence—particularly that showing Turnbaugh was going to the gym, swimming, and lifting weights—suggests better functioning than indicated by her earlier examinations.   (Tr. 18.)   He pointed out that, because there is no information regarding how long Turnbaugh engaged in these activities, a limitation to a range of sedentary work was better supported by the record.   *Id.*

The undersigned finds that the ALJ properly evaluated Ms. Harris' opinion under the new regulations.   Ms. Harris indicated that the medical findings supporting her opinion regarding Turnbaugh's limitations were Turnbaugh's "weight, BMI, [and] previous exams."   (Tr. 1154.)   The medical evidence, however, reveals that Turnbaugh's morbid obesity did not prevent her from engaging in activity including frequent walking and exercising at a gym.   Further, medical examinations, including Ms. Harris' own examinations, revealed few abnormalities.   Thus, the

ALJ did not err in finding Ms. Harris' opinion that Turnbaugh could only sit for a total of two hours, could stand for less than two hours, and would be frequently off task and absent was unsupported by the record.

**2. RFC**

The ALJ determined that Turnbaugh had the RFC to perform sedentary work, with the following additional limitations:   an option to stand up, move about, stretch, and change positions for one minute out of every thirty minutes; cannot climb ladders, ropes, or scaffolds; can occasionally stoop and balance; cannot kneel, crouch, or crawl; can frequently reach, handle, and finger on the right; must avoid concentrated exposure to excessive vibration, extremes of heat and cold, humidity, and pulmonary irritants; must avoid all exposure to unprotected heights; and can perform simple, routine, repetitive tasks, involving occasional decision-making, occasional changes in the work setting, and no paced production work.   (Tr. 16.)

Turnbaugh argues that the RFC formulated by the ALJ is not supported by the weight of the evidence.   In support of this argument, she contends that the ALJ "is not a physician and cannot just reject opinion evidence out of hand," and is not capable of "assessing the limitations" imposed by impairments.   (Doc. 17 at 17.)   Turnbaugh argues that, if the ALJ had "given Nurse Harris's opinion the proper analysis," Turnbaugh would be found disabled.   *Id.*   Turnbaugh next argues that the medical record substantiates her complaints of pain.   *Id.*

A claimant's RFC is the most she can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).   It is the ALJ's responsibility to determine a claimant's RFC by evaluating all medical and non-medical evidence of record.   20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.   Some medical evidence must support the ALJ's RFC finding, but there is no requirement that the evidence take the form of a specific

medical opinion from a claimant's physician.   *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).   "The determination of a claimant's RFC during an administrative hearing is the ALJ's sole responsibility and is distinct from a medical source's opinion."   *Wallenbrock v. Saul*, No. 4:20-CV-00182-SRC, 2021 WL 1143908, at *6 (E.D. Mo. Mar. 25, 2021) (citing *Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)).   Additionally, when determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).

Turnbaugh's argument that the ALJ's RFC determination is not supported by substantial evidence because the ALJ is not a physician and cannot assess limitations lacks merit.   It is the responsibility of the ALJ—not a physician—to determine a claimant's RFC.   *See Wallenbrock,* 2021 WL 1143908, at *6; *Kamann*, 721 F.3d at 950-51.   The ALJ considered the medical evidence of record, including the opinion of Ms. Harris, in determining Turnbaugh's RFC.   As previously discussed, the ALJ incorporated some of the limitations found by Ms. Harris into the RFC, but found other limitations were not supported by the record.   The Court finds that the ALJ did not impermissibly "play doctor" in making the RFC finding, but instead determined the RFC based on all of the evidence as required by SSA regulations.

Turnbaugh next argues that her complaints of pain are substantiated by the record. Turnbaugh testified that she lies in bed for six hours during the day and is in bed twelve hours at night, due to her impairments.   (Tr. 53-54.)

Part of the RFC determination includes an assessment of a claimant's credibility regarding subjective complaints.   Using the *Polaski* factors, "[s]ubjective complaints may be

discounted if there are inconsistencies in the evidence as a whole."   *Polaski v. Heckler*, 739 F.2d

1320, 1322 (8th Cir. 1984); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (noting

*Polaski* factors must be considered before discounting subjective complaints).   The *Polaski*

factors include (1) the claimant's daily activities; (2) the duration, frequency and intensity of the

pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of

medication; and (5) functional restrictions.   *Polaski*, 739 F.2d at 1322; *see also* 20 C.F.R. §

416.929(c)(3).

     Here, the ALJ considered the *Polaski* factors.   The ALJ found that the following factors

detracted from the credibility of Turnbaugh's subjective complaints: (1) Turnbaugh stopped

working prior to her alleged onset date of disability for reasons other than her impairments; (2)

medical records revealed improvement only fifteen weeks following surgery for the injuries

sustained in the 2015 automobile accident; (3) physical examinations documented few

abnormalities; (4) Turnbaugh reported engaging in significant physical activity during the

relevant period, including going to the gym five times a week, swimming, and moving heavy

objects; and (5) Turnbaugh testified that her prescribed pain medication "helps a lot" to control

her pain (Tr. 49).   Thus, the ALJ did not err in finding Turnbaugh's subjective complaints of

limitations that require her to be essentially bedridden were not supported by the record.

     The undersigned finds that the evidence relied upon by the ALJ constitutes substantial

evidence, including medical evidence, to support the RFC assessment.   With regard to

Turnbaugh's musculoskeletal impairments, the ALJ considered the objective medical evidence,

including the results of imaging and the limited findings on examination.   He also properly

considered the opinion of Ms. Harris.   The limitations imposed by the ALJ on Turnbaugh's

ability to lift, climb, stoop, crouch, reach, handle, finger, and be exposed to environmental

factors are all supported by Ms. Harris' opinion.   The ALJ considered Turnbaugh's obesity and its impact on her other impairments when restricting her to sedentary work.   The ALJ also adequately considered Turnbaugh's sleep apnea.   He indicated that the fatigue associated with sleep apnea further supports the restriction to sedentary work, and also assessed restrictions on exposure to pulmonary irritants due to her sleep apnea.   (Tr. 18.)   The ALJ's determination that Turnbaugh was capable of performing a range of sedentary work is consistent with Turnbaugh's daily activities, including her ability to lift weights, swim, go to the gym, and walk for exercise during the relevant period.   Finally, the ALJ restricted Turnbaugh to a limited range of simple work, with no paced production positions, due to her mental impairments.

The Court cannot reverse the ALJ's decision "merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently."   *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 369 (8th Cir. 2016) (citation omitted).   "[T]here is no requirement that an RFC finding be supported by a specific medical opinion."   *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).   After careful review of the record, the Court cannot say that the ALJ's decision "lies outside the available zone of choice."   *See Twyford v. Comm'r, Soc. Sec. Admin.*, 929 F.3d 512, 518 (8th Cir. 2019) (citation omitted).

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of January, 2022.